CLERKS OFFICE U.S. DIST. COURT
AT LYNCHBURG, VA
FILED
02/08/2018
JULIA C. DUDLEY, CLERK
BY:  s/ F. COLEMAN
DEPUTY CLERK

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF VIRGINIA
### LYNCHBURG DIVISION

ACA FINANCIAL GUARANTY CORPORATION
AND UMB BANK, N.A.,

*Plaintiffs*,

v.

CITY OF BUENA VISTA, VIRGINIA, *ET AL.*,

*Defendants.*

CASE NO. 6:17–cv–00013

MEMORANDUM OPINION

JUDGE NORMAN K. MOON

 This case is about soured financing for a municipal golf course in the City of Buena Vista, Virginia. Through agreements in 2005, the City procured funds to renovate and service debt on the golf course. For initial purposes, one can conceptualize these agreements as creating a mortgage. The City and its recreational authority ("Authority") received cash from a bank. In return, the City pledged, "subject to appropriations," to repay the loan. The golf course property served as security to protect the bank from nonpayment. But the City also pledged unusual collateral: City Hall, the police department, and the local courthouse (collectively, "City Hall").

 Since 2015, the City has refused to make payments. But the plaintiffs here (the bank and the loan insurer) do not currently seek foreclosure on the secured properties. Rather, they filed this suit seeking damages under various contract, quasi-contract, and tort theories.

 In truth, the story is much more complex. It involves a lease agreement, a trust agreement, two deeds of trust (one of which the City asserts is void), a forbearance agreement, and municipal bonds. And these documents frequently cross-reference each other. To orient the reader with the basic features of this case, a rough summary of the structure of the 2005 agreements follows. A diagram is attached as an appendix to this opinion.

**The golf course**.  The Authority leased the golf course to the City in exchange for long-term rent payments.

**The money and the bonds**.  But the Authority—through a Trust Agreement—immediately assigned those long-term rent payments to Plaintiff UMB Bank (actually, its predecessor in interest SunTrust, but henceforth "UMB Bank").  It did so to repay UMB Bank, because UMB Bank had agreed to purchase municipal bonds offered by the Authority, thus immediately injecting the outside cash (over $9 million) into the golf course project.

**The collateral**.  To entice UMB Bank to provide this financing (and to protect it if the City failed to pay rent), both the City and the Authority executed deeds of trust for the benefit of UMB Bank.  The Authority Deed of Trust offered the golf course property as collateral, and the City Deed of Trust listed city hall, the police department, and the courthouse as security.

**The insurer**.  Finally, as added protection from nonpayment by the City, UMB Bank insured the bonds through Plaintiff ACA Financial Guaranty Corporation ("ACA").  So, if the City reneged on its rent (which, recall, effectively operated as loan repayments), ACA would pay off the bonds, and UMB Bank would not be left holding the bag.  In return, ACA was made a third-party beneficiary of the Trust Agreement between the Authority and UMB Bank, thus giving ACA certain rights and remedies it otherwise lacked.

So, the possibility the City might balk at its payments was widely contemplated.  It now having done so, Plaintiffs sued for damages.  Defendants assert that the Complaint fails to state a claim.[1]  Two points suffice to resolve most of the motion to dismiss.

---

[1]     I already denied a motion to dismiss for failure to join required parties, *i.e.*, the Trustees. (Dkts. 53, 54).  Although none of the claims are directed against them, I concluded the Trustees are, technically, necessary parties, but their presence would not destroy jurisdiction.  (Dkt. 29 at 4–8; dkt. 53 at 2–5).  So they were added as parties and filed answers.  (Dkts. 62, 63).  With that, the merits arguments over the Complaint's viability are ripe for decision and properly before me.

First, contrary to the City's contention, its deed of trust is not void under Article 7, Section 9 of the Virginia Constitution, because the deed of trust is not a "sale" of the City's property. This conclusion negates the claims Plaintiffs pled in the alternative—*i.e.*, those contingent upon a finding of the deed of trust's invalidity.

Second, to the extent the contracts here purport to create obligations of payment, they do so expressly "subject to appropriations" by the City. Under Virginia law, this proviso makes the obligations only moral ones that are not legally enforceable and cannot support damages. Consequently, Plaintiffs cannot show a breach due to nonpayment.

Plaintiffs' sundry other theories of breach do not hold up against scrutiny. Nor are Plaintiffs seeking in this lawsuit a judicial foreclosure on the properties covered by the operative deeds of trust. Accordingly, this case will be dismissed with prejudice.

## STANDARD OF REVIEW

To determine whether a Complaint states a legal claim, the Court must accept as true all well-pled allegations, draw reasonable inferences in favor of the plaintiff, disregard the Complaint's legal conclusions and arguments, and ensure the plaintiff offers more than a formulaic recitation of the elements. *See generally Ashcroft v. Iqbal*, 556 U.S. 662 (2009). The Court also considers the operative contract documents attached to the Complaint. *Leichling v. Honeywell Int't, Inc.*, 842 F.3d 848, 851 (4th Cir. 2016).

The Complaint includes extensive allegations characterizing the terms of the agreements underlying this lawsuit. The Court includes these allegations in recounting the Complaint to help familiarize the reader with this lawsuit and the full scope of the contentions. The Court does not defer to these characterizations when undertaking its legal analysis, as legal conclusions—unlike properly pled facts—do not bind the Court. *See Beck v. McDonald*, 848 F.3d 262, 271 (4th Cir.

2017); *SD3, LLC v. Black & Decker, Inc.*, 801 F.3d 412, 422 (4th Cir. 2015).

**FACTS AS ALLEGED**

The Authority owns the golf course, which it leased (and apparently continues to lease) to the City. (Complaint ¶ 8). Although intended to boost the local economy, the golf course allegedly flopped. (*Id.* ¶ 9). So the Authority needed money to refinance the course and make improvements. (*Id.* ¶ 10). The City Council hence passed a resolution on April 4, 2005 "which outlined the basic parameters for a bond financing transaction" valued at over $9 million. (*Id.*).

**The 2005 Resolution**

The resolution (which passed by a 4–0 vote, with three councilmembers absent) allegedly approved various "Financing Documents" for the golf course project. These documents included the Authority-City lease of the golf course, a trust agreement between the Authority and UMB Bank, and two deeds of trust securing UMB Bank—one from the Authority with the golf course as security, and the other from the City with the "existing City Hall building and police station as security." (Dkt. 1-2 (Resolution), Recitals (a)–(d)).

**The Trust Agreement (between UMB Bank and the Authority) and the Bonds**

Bonds were issued as contemplated by the Trust Agreement. (*See* Complaint ¶ 13). Plaintiff UMB Bank was identified as the Trustee. The Trust Agreement assigned to UMB Bank (among other things) the Authority's right to receive the City's rent payments for the golf course due under the City-Authority Lease Agreement. (*Id.* ¶ 14; Trust Agreement §§ 101(a), 102(a)). Functionally, then, the City would finance the bonds (issued by the Authority to fund the golf course) by paying the trustee (UMB Bank, who provided cash by initially purchasing the bonds) the City's rent over time (which otherwise would have been paid to the Authority).

Plaintiff ACA also factored in: It insured the bonds, and the Trust Agreement made it a

third-party beneficiary to both the Trust Agreement and, ostensibly, the "Basic Agreements"—*i.e.*, the City/Authority Lease, the City Deed of Trust, and the Authority Deed of Trust. (Trust Agreement, § 1606 & Definitions).

## The City's Deed of Trust

As security for bond payments and the City's lease obligations, the City executed a deed of trust for the benefit of UMB Bank. (Complaint ¶ 19). The City agreed to "pay all indebtedness secured by this Deed of Trust . . . at the times and in the manner and amounts set forth in the Bonds, this Deed of Trust, and the Trust Agreement." (*Id.* ¶ 20 (citing § 1.1)). The City also agreed to comply with all federal, state, and local rules and regulations governing the "Secured Property." (*Id.* ¶ 21 (citing § 1.11)). The security offered by the City Deed of Trust included city hall, the police department, and the local courthouse facilities. (*Id.* ¶ 23).

Upon an event of default (as defined in Article III of the City Deed of Trust), UMB Bank could immediately accelerate "all sums due on or by reason of the Trust Agreement, the Bonds or this Deed of Trust," and take possession of "all or any portion of the Secured Property and sell" it at auction. (Complaint ¶ 24 (citing Article IV)). The Deed of Trust also permitted UMB Bank to enter onto, take possession of, and operate the Secured Property without a court order. (*Id.* ¶ 25 (citing §§ 4.4, 4.5)). The City acknowledged the possibility of being evicted from City Hall in an Essentiality Certificate. (*Id.* ¶ 26). The City Deed of Trust, however, excluded foreclosure on the courthouse facilities, on the grounds that state law vested local judges with ultimate control over those facilities. (*Id.* ¶¶ 27 (citing Article IV)).

## The Authority's Deed of Trust

The Authority also executed a Deed of Trust naming UMB Bank as the beneficiary. And again, the document was meant in part to secure compliance with the terms of the "Bonds, this

Deed of Trust, the Lease Agreement, and the Trust Agreement . . ." (Complaint ¶ 30). The provisions of the Authority Deed of Trust are largely the same as the City's. The secured property for the Authority Deed of Trust, however, is the golf course.

Citing both the City's and Authority's Deeds of Trust, Plaintiffs allege that, to induce them into providing the bond financing and insurance, the Authority and City granted them "a comprehensive bundle of express assurances and security interests to protect [them] in the event the Bonds were not timely and fully repaid." (Complaint ¶ 37).

### The Opinion Letters

Plaintiffs allege that opinion letters from April 14, 2005 by the City's and Authority's attorneys "provided further . . . assurances" that the Financing Documents are valid. (Complaint ¶ 55). A letter from the City Attorney asserted that the April 4th resolution, the Lease Agreement between the City and the Authority, and "the consummation by the City of the transactions contemplated by them" are lawful, valid documents. (Complaint ¶ 56 (quoting Kearney Letter)). The letter emphasized that the "City Resolution was duly adopted by the City Council of the City [*sic*] and is in full force and effect." (Kearney Letter ¶ 2).

As special counsel for the City, law firm LeClair Ryan also wrote an opinion letter regarding the City Deed of Trust. The firm opined that the City Deed of Trust created a valid security interest; was "duly authorized, executed and delivered[;] constitutes the valid and binding obligation of the City[;] and is enforceable in accordance with its terms" regarding the City Hall property. (Complaint ¶ 57 (quoting LeClair Ryan Letter for City ¶¶ 1, 2)). LeClair Ryan further opined on other Financing Documents, similarly affirming the validity and enforceability of those agreements. (Complaint ¶ 58 (quoting Second LeClair Ryan Letter ¶ 1)). But the letter stated that the City's obligation to pay rents under the Lease Agreement "is subject

to and dependent upon the City Council making annual appropriations for such purpose." (*Id*.).[2]

### The Forbearance Agreement

In 2010 and 2011, the City allegedly failed to make rent payments under the Lease Agreement sufficient to service the bond payments, and it appropriated only a portion of the rent payments for 2012. (Complaint ¶ 38). Defendants requested Plaintiffs forbear their rights under the Financing Documents. (*Id*. ¶ 39).

The City, the Authority, and ACA consequently executed the Forbearance Agreement on July 1, 2011, allegedly permitting the City to service 50% of its debt over five years and the other 50% five years after the bonds' maturity date. (*Id*. ¶ 40). In the event of additional nonpayments, ACA allegedly had the right to terminate the Agreement and exercise any rights it had under the Financing Documents. (*Id*. ¶ 41). In entering into the Forbearance Agreement, both the City and the Authority ratified and reaffirmed "the validity and binding nature" of the original Financing Documents. (*Id*. ¶ 42 (citing Forbearance Agreement § 6)).

### The City's Subsequent Nonpayment

The City Council voted in January 2015 to cease payments altogether and has not made any since. (Complaint ¶ 43). Plaintiffs, "upon information and belief," contend that the City can afford to make payments, but that "for political or other reasons—perhaps recognizing, in retrospect, that" the golf course was a bad idea—it refuses to make appropriations. (*Id*. ¶¶ 44–45).

According to Plaintiffs, the City has asserted prior to initiation of this lawsuit that the

---

[2]    Carolyn Perry, attorney for the Authority, also penned an opinion letter regarding documents to which the Authority was a party, writing that the Lease Agreement, the Trust Agreement, and the Authority Deed of Trust were valid, duly authorized, enforceable obligations of the Authority, and that performance of them would not violate the law. (Complaint ¶ 59 (quoting Perry Letter ¶¶ 2, 6))

City Deed of Trust is void *ab initio* because only four of seven councilmembers voted on and for it. (Complaint ¶ 48). Plaintiffs alleged that the operative documents and other facts belie this assertion. (*Id.* ¶¶ 49–50).

Based on the foregoing allegations and the Financing Documents, Plaintiffs assert ten claims noted below, most of which sound in contract.[3]

## ANALYSIS

## I. Procedural and Threshold Matters

Before turning to the core claims presented by this case, the Court clears out some underbrush. By way of summary, Counts 1, 8, 9, and 10 will be dismissed.

Count 1 seeks a declaratory judgment regarding the validity of the Financing Documents. But a declaratory judgment is a remedy, not a substantive claim. Moreover, the only Financing Document whose validity is in question is the City Deed of Trust. The Court must already pass upon its validity as a threshold question in assessing Count 3, alleging a breach of that deed. So it serving no purpose, the declaratory judgment count will be dismissed as explained further below.

The Court will then turn to the parties' arguments regarding the validity of the City Deed of Trust. Ultimately, the Court concludes that it is not void.

---

[3] The claims are: (1) a declaratory judgment count to establish the validity of the Financing Agreements; (2) breach of the Trust Agreement by the Authority; (3) breach of the City Deed of Trust; (4) breach of the Authority Deed of Trust; (5) breach of the Forbearance Agreement by both defendants; (6) breach of Lease Agreement by the City; (7) breach of implied covenant of good faith and fair dealing by both defendants; (8) appointment of a receiver based on both Deeds of Trust; (9) constructive fraudulent inducement by both defendants; and (10) "Restitution/Unjust Enrichment/*Quantum Meruit.*"

Next, Plaintiffs lodged claims for fraudulent constructive inducement (Count 9) and unjust enrichment/*quantum meruit* (Count 10). These claims were pled alternatively in the event that the City Deed of Trust was void. Since it is not void, Counts 9 and 10 warrant dismissal.

And Count 8, seeking appointment of a receiver over the golf course, involves a discretionary judicial remedy governed by federal common law and is not a freestanding, substantive, state law claim. So it too will be dismissed.

## A.    Declaratory Judgment (Count 1)

In their first count, Plaintiffs ask the Court to "declare that the Financing Documents are valid and enforceable." (Complaint ¶ 71). The City observes that Plaintiffs already have six counts alleging various breaches of the Financing Documents, which will require actual resolution of their validity. (Dkt. 9 at 23). It contends Count 1 "will not serve a useful purpose in clarifying the legal relations or afford relief from the controversy," because the "validity of the Financing Documents is [already] an element that must be proven to establish Plaintiffs' breach claim." (*Id*. at 25). The Court agrees.

The Declaratory Judgment Act, 28 U.S.C. § 2201, creates a remedy, not a substantive cause of action. Its operation "is procedural only. Congress enlarged the range of remedies available in the federal courts but did not extend their jurisdiction." *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671 (1950); *see CGM, LLC v. BellSouth Telecommunications, Inc.*, 664 F.3d 46, 55 (4th Cir. 2011). Put differently, a declaratory judgment is simply the remedial procedural vehicle by which a court can declare the rights of the parties as to an underlying legal dispute over which jurisdiction is otherwise proper. *See* 10B Wright & Miller, Fed. Prac. & Proc. Civ. §§ 2751, 2754, 2756, 2766 (4th ed.). Its purpose is to allow "prospective *defendants* to sue to establish their nonliability," not create a substantive tack-on claim for an already-

existing plaintiff who is adjudicating an already-live legal issue. *See Beacon Theatres, Inc. v. Westover*, 359 U.S. 500, 504 (1959); *Discover Bank v. Vaden*, 396 F.3d 366, 371 (4th Cir. 2005) (Under the Declaratory Judgment Act, "a party which traditionally would be a defendant can bring a preemptive suit in federal court, thus accelerating the claim against it.").[4]

Thus, to the extent Plaintiffs wish to obtain a judgment establishing the validity of the contracts, they would do so by proving their substantive contract claims.[5] One cannot, after all, succeed on a breach of contract claim without first establishing that a valid contract exists. *See Sunrise Continuing Care, LLC v. Wright*, 277 Va. 148, 154 (Va. 2009).

In sum, Count 1 is not a freestanding claim, and the issue it raises is already a part of what is squarely presented in this case. Accordingly, it will be dismissed.

### B. Validity of the City Deed of Trust

Turning to that squarely presented issue, as a defense to Count 3 the City asserts that its

---

[4]    In other words, had the City, before initiation of this lawsuit, wished to establish that the deed of trust is void—*i.e.*, prove that it had a defense to a threatened breach of contract claims— it could have filed a declaratory judgment action that "accelerated," in *Vaden*'s words, the contract claim and the purported defense. But since Plaintiffs came to court first and asserted their contract claim, and because the City has asserted voidness as a defense to that claim, there is no need for a declaration on an issue already squarely presented.

[5]    Importantly, the only one of those documents the validity of which the parties dispute is the City Deed of Trust. A declaratory judgment action regarding the validity of any other of the documents would, on this record, not be justiciable. *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 127 (2007) (requiring parties to declaratory judgment action to have actually adverse legal interests over a "real and concrete" dispute, rather than presenting merely a hypothetical issue); *Dyer v. Md. State Bd. of Educ.*, 685 F. App'x 261, 262 (4th Cir. 2017). Although Plaintiffs mention a declaration about whether they can foreclosure on property secured in the City Deed of Trust, Complaint ¶¶ 23, 68, foreclosure is not a remedy they seek, *id.*, Prayer for Relief, nor it is one that Defendants currently dispute. (Dkt. 35 (Hr'g Tr.) at 28 (admitting that Plaintiffs have "had an absolute right to foreclose since 2014" when payments stopped), 48–49 (conceding, *inter alia*, that Plaintiffs "can foreclose if they want to foreclose" and "the City deed of trust, if it's deemed to be valid, they can foreclose"), 57; *see also* Complaint ¶ 28 ("Plaintiffs acknowledge that they cannot foreclose on the local courthouse facilities, which are controlled by the judiciary")). The matter thus is premature and lacks adversity, so the Court will not issue on advisory opinion on it.

deed of trust covering City Hall, the police department, and the local courthouse building is void under the Virginia Constitution. Its logic is as follows. First, Article VII, Section 9 states that "[n]o rights of a city . . . in or to . . . public places . . . shall be *sold* except by an ordinance or resolution passed by a recorded affirmative vote of three-fourths of all members elected to the governing body." Second, a deed of trust is a "sale." Third, the City Council's Resolution authorizing the Deed of Trust was not made by three-fourths (or 75%) vote: Only four of seven members affirmatively voted for the proposal with three members absent, resulting in a four-sevenths, or 57%, vote. Therefore, the document is void.

The City's argument comes up short at the second step. A deed of trust is an encumbrance on real property akin to a mortgage; it is not a sale. Black's Law Dictionary (10th ed. 2014) (explaining that deed of trust "resembles a mortgage"); *Maryland Nat. Mortg. Corp. v. Albanese*, 26 Va. Cir. 362, 1992 WL 12033445, at *1–2 (Arlington Cnty. Cir. Ct. 1992) (rejecting argument that deed of trust is a "sale"). Such has been the law of Virginia for over a century.

As far back as 1902, the Supreme Court of Virginia explained that a "mortgage or deed of trust is simply security for the debt." *Augusta Nat. Bank v. Beard's Ex'r*, 42 S.E. 694, 696 (Va. 1902). In more recent times, Virginia has reaffirmed the longstanding view that "the essence of a mortgage or deed of trust is that it creates a lien on property to secure a debt." *Deutsche Bank Nat. Tr. Co. v. Arrington*, 290 Va. 109, 117 (Va. 2015) (quoting *Interstate R.R. Co. v. Roberts*, 105 S.E. 463, 464 (Va. 1920)); *see id*. at 118 (holding that "fundamental nature of a deed of trust" creates a debtor-creditor relationship); *High Knob Assocs. v. Douglas*, 249 Va. 478, 484 n.4 (Va. 1995) ("A deed of trust merely creates a lien on property to secure a debt."). And Virginia courts have consistently held in the statutory context that the holder of a deed of

trust is not an "owner," as one would expect if a deed of trust were a sale. *Williams v. Fairfax Cty. Redevelopment & Hous. Auth.*, 227 Va. 309, 314 (Va. 1984); *Loyola Fed. Sav. & Loan Ass'n v. Herndon Lumber & Millwork, Inc.,* 218 Va. 803, 805 (Va. 1978); *Fonticello Mineral Springs Co. v. City of Richmond*, 147 Va. 355, 368–69 (Va. 1927).

Relatedly, the "grantor [in a deed of trust] retains his ability to deal with the encumbered property as its owner." *High Knob*, 249 Va. at 484 n.4; *see* Black's Law Dictionary (10th ed. 2014) (observing that encumbrances like liens and mortgages do not defeat subsequent transfers but endure after them). This point further establishes that a deed of trust is not a sale.[6] Logically, a deed of trust does not effectuate a sale, because if it did, then the grantor would not own the property (encumbered though it may be) to be able to pass it to a subsequent purchaser. *Albanese*, 1992 WL 12033445, at *2 (observing, in deed of trust context, that one "cannot convey that which he does not have"); *see Toyota Motor Credit Corp. v. C.L. Hyman Auto Wholesale, Inc.*, 256 Va. 243, 247 (Va. 1998) ("Longstanding Virginia law provides that one who does not have title to goods cannot transfer title to a buyer."). The principle is illustrated by *Hale v. Horne*, which observed that:

> [i]t was entirely competent, therefore, for Mitchell, after the conveyance of his land in trust for the payment of debts, to make an absolute conveyance of them to Nuckols and Gregory. And his deed was good to pass title to them, subject, however, to the incumbrance [*sic*] of the deed of trust.

*Hale v. Horne*, 62 Va. 112, 122 (Va. 1871).

The case law, common sense, and ordinary usage of language all indicate the same result. A deed of trust, like a mortgage, is not a "sale" of real property, but a method of encumbering the

---

[6] "It is true that one who has acquired a direct interest in land by way of lien, or by mortgage, or by deed of trust is often referred to by commentators and the courts as a purchaser; but this does not mean that a creditor secured by a trust deed has an interest that amounts to a right of property in the land." *Augusta Nat. Bank*, 42 S.E. at 696; *see Runkle v. Runkle*, 37 S.E. 279, 279 (Va. 1900).

property to secure a debt. And that's precisely what the parties set out to do. Moreover, because a grantor of a deed of trust retains power to sell the property in question (subject only to the lien created by the deed of trust), the deed of trust cannot itself be a sale.

As an alternative to its constitutional voidness argument, the City posits a statutory one based on Va. Code § 15.2-1800(B), but it too falls flat. The statute grants a locality the power to "dispose of its real property" through the "sale" or "pledge" of it, as well as several other methods. That authorization is "[s]ubject to any *applicable* requirements of Article VII, Section 9." (emphasis added). The City (over)reads this language as imposing the three-fourths requirement in Article VII, Section 9 throughout the entirety of § 15.2-1800(B). From this, the City then assumes that a deed of trust is a "pledge," and thus its deed of trust is suddenly subject to the three-fourths requirement.

The flaw with this view is that the constitutional three-fourths requirement applies only to property "sold" by a locality, Va. Const. Art. VII, § 9, and the statute's grant of power is limited only by the "applicable" requirements of the constitutional provision. As a result, the only transaction in § 15.2-1800(B) governed by the constitutional three-fourths requirement is the sale of a locality's "real property."[7] Said differently, the property transactions authorized by the statute (*i.e.*, sales, leases, exchanges, mortgages, pledges, and other methods) are far broader than those limited by the constitutional three-fourths requirement. Because Article VII, Section 9 does not require a supermajority vote to approve a "pledge" of public property, the three-fourths

---

[7]     Indeed, the limitation is even narrower than that. Unlike the statute, which broadly authorizes the sale of "real property," the constitutional provision refers in a more limited fashion to various enumerated and unenumerated "public places." But not all publically owned property is a "public place." So while a locality would need a three-fourths vote to sell a park, it seems consistent with both § 15.2-1800(B) and Article VII, Section 9 that a locality would *not* need such a vote to sell, say, condemned property or an industrial complex.

– 13 –

requirement is not imported into § 15.2-1800(B) for that type of transaction.[8]

## C.    Claims Pled in the Alternative (Counts 9 and 10)

Plaintiffs pled Count 9 (fraudulent inducement) and Count 10 (unjust enrichment, also known as *quantum meruit*[9]) in the alternative in the event the City Deed of Trust was void.  (Dkt. 17 at 40–42 & n.5; dkt. 35 (Hr'g Tr.) at 80–81, 83).[10]  Having determined that the City Deed of Trust is not void, the Court will dismiss the alternative claims.

## D.    Appointment of a Receiver (Count 8)

Count 8 seeks appointment of a receiver for City Hall, the police department, and the golf course under § 4.5 of both Deeds of Trust.  (Compliant ¶¶ 133−34).  The parties do not discuss whether federal or state law applies to the appointment of a receiver.  As it turns out, a

---

[8]    Since the City's arguments that its deed of trust violated Virginia law are unavailing, the Court need not consider whether the deed of trust is void or merely voidable.  The distinction is notable because voidable (but not void) actions would be subject to ratification by a subsequent City Council, which Plaintiffs argue occurred when the City entered into the Forbearance Agreement.  *See Princess Anne Hills Civic League, Inc. v. Susan Constant Real Estate Trust*, 243 Va. 53, 61–62 (Va. 1992); *Kennedy v. Annandale Boys Club, Inc.*, 221 Va. 504, 506 (Va. 1980); *City of Bristol v. Dominion Nat. Bank*, 153 Va. 71, 83–85 (Va. 1929); *Norton Grocery Co. v. People's Nat. Bank of Abingdon*, 151 Va. 195, 202 (Va. 1928).

[9]    *Seagram v. David's Towing & Recovery, Inc.*, 62 F. Supp. 3d 467, 477 (E.D. Va. 2014) (explaining technical differences attended by the same elements).  Although Count 10 is entitled "Restitution/Unjust Enrichment/Quantum Meruit," Plaintiffs do not contest Defendants' observation that restitution is a remedy, not a claim.

[10]    Plaintiffs' theory of their fraudulent inducement claim is that Defendants falsely represented their authority to enter into the contracts at issue in this case.  (Dkt. 17 at 39–40 (citing Complaint ¶ 137)).  But the only document whose validity has been disputed is the City's Deed of Trust.  Because that document was not void, the City's representations that it had authority to enter into it are not false, and thus not fraudulent.  *State Farm Mut. Auto. Ins. Co. v. Remley*, 270 Va. 209, 218 (Va. 2005) (requiring "false representation" as element).

As for unjust enrichment/*quantum meruit*, it fails when, as here, there is an express contract—"there is no need to imply one because the parties have already negotiated an agreement." *Mongold v. Woods*, 278 Va. 196, 204 (Va. 2009) (citing *Nedrich v. Jones*, 245 Va. 465, 477 (Va. 1993)); *see Raymond, Colesar, Glaspy & Huss, P.C. v. Allied Capital Corp.*, 961 F.2d 489, 491 (4th Cir. 1992) (applying Virginia law); *Lion Assocs., LLC v. Swiftships Shipbuilders, LLC*, 475 F. App'x 496, 503 (4th Cir. 2012) (same).

receivership is an issue of federal procedural and common law.

Federal procedural rules "govern an action in which the appointment of a receiver is sought or a receiver sues or is sued." Fed. R. Civ. P. 66. A "district court has within its equity power the authority to appoint receivers and to administer receiverships." *Gilchrist v. Gen. Elec. Capital Corp.*, 262 F.3d 295, 302 (4th Cir. 2001).[11] "The appointment of a receiver in a diversity case is a procedural matter governed by federal law and federal equitable principles." *Aviation Supply Corp. v. R.S.B.I. Aerospace, Inc.*, 999 F.2d 314, 316 (8th Cir. 1993); *see Canada Life Assur. Co. v. LaPeter*, 563 F.3d 837, 842–43 (9th Cir. 2009); *Nat'l P'ship Inv. Corp. v. Nat'l Hous. Dev. Corp.*, 153 F.3d 1289, 1292 (11th Cir. 1998); *LNV Corp. v. Harrison Family Bus., LLC*, 132 F. Supp. 3d 683, 689 (D. Md. 2015) ("[A]ppointment of a receiver by a federal court in a diversity action appears to be a question properly determined on the basis of federal law.").

The logical corollary of that principle is that a receivership is not a substantive cause of action. *See Kelleam v. Md. Cas. Co. of Baltimore*, 312 U.S. 377, 381 (1941) ("A receivership is only a means to reach some legitimate end sought through the exercise of the power of a court of equity. It is not an end in itself."); *Canada Life*, 563 F.3d at 843 ("the appointment of a receiver does not directly affect the outcome of the underlying litigation"); *Nat'l P'ship Inv. Corp.*, 153 F.3d at 1291 ("First and foremost, the appointment of a receiver in equity is not a substantive right; rather, it is an ancillary remedy which does not affect the ultimate outcome of the action."); *see also Hutchinson v. Fid. Inv. Ass'n*, 106 F.2d 431, 436 (4th Cir. 1939). A receivership is an equitable remedy fashioned by the Court to prevent or cure fraud, irreparable harm, or waste,

---

[11] When a court does so, the receiver "may sue and be sued as provided by federal law" and is "directed to manage and operate the receivership estate according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof." *Gilchrist*, 262 F.3d at 302 (citing 28 U.S.C. §§ 754, 959.)

particularly while litigation is pending. *See Lias v. United States*, 196 F.2d 90, 91–92 (4th Cir. 1952) (finding receiver *pendent lite* was "only adequate remedy" in case involving tax liens where owner of closely-held family companies had drained and concealed assets); *Aviation Supply*, 999 F.2d at 316–17; *Santibanez v. Wier McMahon & Co.*, 105 F.3d 234, 241 (5th Cir. 1997) ("Courts have held that receivers may be appointed to preserve property pending final determination of its distribution in supplementary proceedings in aid of execution."); *e.g.*, *SEC v. Bowler*, 427 F.2d 190, 197–98 (4th Cir. 1970).

These authorities reveal that Count 8 should be dismissed because "appointment of a receiver" is a not an independent legal claim.[12]

## II.     The Contract Claims

Turning to the heart of this matter, the parties presume Virginia substantive law governs this diversity case, and the Court concurs. A breach of contract claim has three elements: (1) an enforceable obligation, *e.g.*, a contract, (2) violation of the obligation, and (3) damages caused by that violation. *Sunrise Continuing Care, LLC v. Wright*, 277 Va. 148, 154 (Va. 2009). With the exception of the City Deed of Trust, which the City asserts is void, the parties do not contest the existence of a contract, but rather dispute the meaning of the various contracts' terms.

### A.     Breach of the Lease (Count 6) and of the Forbearance Agreement (Count 5)

The Lease giving the City possession of the golf course in exchange for rent to the Authority was the lynchpin of the project financing, as it was those payments that Plaintiffs argue they are entitled to. Accordingly, the Court begins with the Lease.

---

[12]     Several cases indicate that the way to request the appointment of receiver in a federal case is through motion rather than through a pleading. *See*, *e.g.*, *LNV Corp*, 132 F. Supp. 3d at 689–91; *Taylor v. Bettis*, 976 F. Supp. 2d 721, 753–54 (E.D.N.C. 2013), *aff'd* No. 16-2239, 2017 WL 2992087 (4th Cir. July 14, 2017); *Lantern Bus. Credit, LLC v. Alianza Trinity Dev. Grp., LLC*, No. 1:16-CV-00107-MR, 2016 WL 8929212, at *1, 4–7 (W.D.N.C. July 8, 2016); *Chesapeake Bank v. Berger*, No. 4:14CV66, 2014 WL 5500872, at *1 (E.D. Va. Oct. 30, 2014).

Because Plaintiffs were not signatories to the Lease, they "must show that the parties to [it] clearly and definitely intended to confer a benefit upon" them. *MNC Credit Corp. v. Sickels*, 255 Va. 314, 320 (Va. 1998). Section 9.4 of the Lease "explicitly recognized" Plaintiff ACA, the bond insurer, "as being a third-party beneficiary of this Lease Agreement," hence satisfying the intent requirement.

As for UMB Bank, § 8.1(a) of the Lease acknowledged that the Authority would, through the Trust Agreement, simultaneously "assign[] all of [the Authority's] rights in and to this Lease Agreement . . . to the Trustee [*i.e.*, UMB Bank] for the benefit of" the bond holders. The City consented to that assignment and agreed "to make all payments due to the Authority under this Lease Agreement directly to" UMB Bank. *Id.* Accordingly, the City and Authority agreed that "[a]ll references" in the Lease "to the Authority shall include [UMB Bank] for the benefit of the" bond holders. *Id.*; *see id.* § 6.2 (providing the UMB Bank may sue to enforce breaches of the Lease). This language created third-party rights in UMB Bank as well.

## 1. Breach of City's alleged obligation to pay rent

A central issue that transcends several Counts is whether the City was under a legally enforceable obligation to make the rent payments. The City contends it was not, because the relevant agreements made the rent payments "subject to appropriations" by the City Council. This language, the City says, created only an unenforceable "moral obligation" to pay rent, rather than a legally binding debt.[13] Dkt. 9 (City's Br.) at 2–11; *see Dykes v. N. Virginia Transp. Dist.*

---

[13] One may wonder: why structure transactions like that? The intricacies of Virginia law governing localities may provide an answer. According to the City, localities generally are able to create debts, or "bonds," by a mere resolution. *See* Va. Code §§ 15.2-2602, 15.2-2636; *see also* Va. Const. art. VII, § 10 (setting limitations on localities' ability to accrue debt). But if a locality's charter mandates a referendum, the charter controls. Va. Code § 15.2-2661. As it turns out, the City's charter requires that "any bonded indebtedness shall be by referendum and passed by a majority of the qualified voters voting in the referendum." City of Buena Vista (Va.)

*Comm'n*, 242 Va. 357, 375 (Va. 1991). Plaintiffs, on the other hand, believe that the City had an enforceable duty to pay rent and that its failure to do so is a breach. Ultimately, the *Dykes* case confirms that Defendants' understanding of the "subject to appropriations" language is correct.

In *Dykes*, the Supreme Court of Virginia considered "whether [a] county will incur a long-term debt proscribed by Article VII, § 10(b) of the Constitution of Virginia." 242 Va. at 361. The Supreme Court decided upon rehearing in the negative. It focused on contractual language in financing and trust agreements stating that the county's payments were "subject to" and "contingent" upon annual appropriations by the board of supervisors. *Id*. at 361–62, 373. The Court stated bluntly: "'Subject to appropriation' financing does not create constitutionally cognizable debt *because it does not impose any enforceable duty or liability* on the County." *Dykes*, 242 Va. at 375.[14] Put another way, when a locality promises to pay subject to its future decision to allocate those payments, it has not made a legally enforceable promise to pay at all.

Plaintiffs proffer no cases interpreting the "subject to appropriation" language differently. Rather, they say *Dykes* is distinguishable because it involved whether there was a debt in a constitutional sense. (Dkt. 17 at 30–31). That is a distinction without a difference. The "rationale" underlying *Dykes*—that contracts with "'subject to appropriation' financing in which

---

Charter, § 2.214. Thus, structuring a bonded debt as only a moral obligation avoids the additional (and perhaps politically challenging) task of referendum approval.

One tradeoff of this arrangement is that the would-be creditor of a moral obligation debt exposes itself to significantly greater risk of nonpayment. But that risk can be offset with other steps, *e.g.*, securing real property as collateral or a higher interest rate. *See* dkt. 9 (City's Br.) at 11 n.3 (arguing that "moral obligation bonds carry a higher interest rate" because "the lender insists upon a high rate to compensate it for the increased risk of nonpayment").

[14] *See Baliles v. Mazur*, 224 Va. 462, 469 (1982) (reviewing cases holding that government's "moral obligation" to make appropriations is not enforceable, even when expectation of appropriations was "an essential ingredient in the negotiations"); Hon. Mary Sue Terry, 1989 Va. Op. Att'y Gen. 55, 1989 WL 433244, at *3–4.

the legislative body is not legally obligated to make the appropriation" do not create "a *legal*

obligation" that "can be enforced against the maker," 242 Va. at 374–75—applies equally to the

terms of a contract in this case, whether the ultimate legal issue presented involves Art. VII, §

10(b) of the Virginia Constitution or not.

Returning to the contracts here, the Lease plainly makes the City's rent payments subject

to the City's later decision to make future appropriations. Section 4.5 recognizes—perhaps as a

nod to Section 10 of the Virginia Constitution—that the "City is not empowered to make any

binding commitment to make [rent payments] beyond the current Fiscal Year" (although the

City's "intent" at the time was to make the payments). Moreover, § 4.5 unambiguously provides

that, "[n]otwithstanding anything in this Lease Agreement to the contrary," the City's payment

obligations under the Lease and Trust Agreements, "including without limitation its obligation to

pay all [rents], *shall be subject to and dependent upon appropriations* being made from time to

time by the City Council for such purpose . . . ."[15] Faced with these provisions, Plaintiffs do not

defend their nonpayment-as-breach theory as to Lease, but assert that "the rent payments *became*

mandatory by virtue of the Forbearance Agreement." (Dkt. 17 at 33 (emphasis added)).

But the same stipulations apply to the 2011 Forbearance Agreement between ACA, the

City, and the Authority. While the Forbearance Agreement created a new payment schedule

after the City's first refusal to appropriate rent, that schedule remained "subject to annual

appropriation." (Forbearance Agreement, §§ 5.1, 5.3). Section 5.4 made the point doubly

---

[15]     The Lease specifically contemplates the nonpayment of rent by the City, singling out that event for special treatment. Nonpayment "shall not constitute an event of default," but instead is controlled by Article VII. (Lease Agreement, § 6.1(c)). Article VII grants the Authority—and thus UMB Bank, per § 8.1(a)(4)—the right to terminate the City's leasehold, exclude it from the golf course with ACA's consent, and then sell or lease the course. (*Id.* §§ 7.1, 7.2). This arrangement comports with the overarching structure of the other April 2005 transactions, especially the Authority Deed of Trust pledging the golf course to UMB Bank as security in the event the City failed to pay rent.

certain, stating that the City's obligations to make the adjusted and deferred rent payments were "subject to annual appropriation by the City Council of amounts sufficient to make such payments." (*Id.*). Close scrutiny reveals that Plaintiffs' arguments to avoid this language, dkt. 17 at 28–30, are unavailing and unsupported by the Forbearance Agreement.

Section 2. To begin, Plaintiffs quote the first sentence of § 2 as stating that Defendants were "obligated to make payments of Basic Rent and Additional Rent[,] as Defined in the Lease." (Dkt. 17 at 28). In truth, this sentence provides that Defendants were "obligated, **subject to annual appropriations as provided in Section 4.5 of the Lease,** to make payments of Basic Rent and Additional Rent, as Defined in the Lease." (Dkt. 1-7 at 2). That is, Plaintiffs omitted without specification an entire clause within the middle of the sentence, a clause which both cut to the heart of the issue and was unfavorable to them.

Plaintiffs then quote the last sentence of § 2 as reading that the City "will continue to make all payments due under the Financing Documents in accordance with the terms of such documents." (Dkt. 17 at 28). What the sentence actually says is: The City "will continue to make all payments due under the Financing Documents in accordance with the terms of such documents**, except as provided by this Agreement**." (Dkt. 1-7 at 2). Given that the Financing Documents and "this Agreement"—including § 2 itself—expressly made the rent payments "subject to annual appropriation," *see* §§ 5.1, 5.3, 5.4, Plaintiffs' reliance on § 2 is unfounded.

Sections 5.1, 5.3, and 5.4. Plaintiffs—selectively quoting portions of §§ 5.1, 5.3, and 5.4—cite those provisions as creating an enforceable obligation to pay. (Dkt. 17 at 28). Yet as detailed above, those sections include the qualifying "subject to annual appropriations" language. Courts construe words in a contract as a whole rather than in isolation, and attempt to give

meaning to all of a contract's terms. *See Ott v. Monroe*, 282 Va. 403, 407 (Va. 2011). Hence, Plaintiffs' argument fails.

Sections 7(iv) and 8. Plaintiffs do correctly observe that failure to make appropriations is an event of default under § 7(iv) of the Forbearance Agreement. Section 8 then defines ACA's rights and remedies upon default, which Plaintiffs assert—with virtually no analysis, *see* dkt. 17 at 29—includes mandatory rent payments from the City. Plaintiffs are mistaken: Section 8 still includes, through incorporation by reference, the "subject to appropriations" limitation, because it adopts the limitations on rent payments imposed by the Lease.

Upon default for nonpayment, § 5.1 of the Forbearance Agreement—setting the schedule of adjusted rent payments themselves subject to annual appropriations—is "of no further force and effect," and "the City shall be obligated to make" rent payments. (Forbearance Agreement, § 8(ii)). However, such payments are made only "on such terms set forth in the Lease." (*Id.*). But recall that § 4.5 of the Lease admits that the City lacks authority to make future commitments of rent and thus payments are "subject to and dependent upon appropriations being made from time to time by the City Council." The upshot, then, is that § 8(ii) of the Forbearance Agreement incorporates the payment terms of the Lease, which itself—in § 4.5—makes payments subject to appropriations.[16]

This same dynamic holds true of § 8(iii), providing reimbursement to ACA for insurance payouts it made to service the bond debt. However you slice it, any so-called obligations are still subject to appropriations.

Start with § 4 of the Forbearance Agreement. It requires, as per the bond insurance policy, ACA to make payments to cover shortfalls caused by the City's failure to pay rent. "All

---

[16] ACA may also terminate the Forbearance Agreement per § 8(i), although that would not itself implicate payment.

such payments made by ACA shall be reimbursed to ACA as deferred [rent] under the Lease, as set forth in [§] 5.4" of the Forbearance Agreement, which once more includes the "subject to appropriations" limitation. (*Id.* §§ 4, 5.4).

Now turn back to § 8(iii). If the City fails to pay, "all amounts paid by ACA pursuant to [§] 4 shall become immediately due and payable to ACA, as assignee of the Authority, *as Basic Rent under the Lease*." (emphasis added). Section 8(iii), in other words, says that the City should reimburse ACA for its insurance payouts, but those reimbursements are both subject to § 5.4 (which makes them "subject to annual appropriations") and treated as rent under the Lease.

This loops us back to the Lease, leading yet again to the "subject to appropriations" condition. Page 3 of the Lease defines "Basic Rent" as "payments payable by the City pursuant to Section 4.2(a)." In turn, § 4.2(a) states that the "City shall pay the Basic Rent to the Trustee on behalf of the Authority, *subject to Section 4.5*." (emphasis added). And § 4.5 of the Lease— as by now must seem repetitive—unambiguously provides that rent payments are "subject to and dependent upon appropriations being made from time to time by the City Council."

\*     \*     \*     \*

So, all roads of the Forbearance and Lease Agreements lead to the "subject to appropriations" condition.[17] Ultimately, then, there is no breach of the Lease or Forbearance

---

[17]      To avoid this conclusion, Plaintiffs cite § 6 of the Forbearance Agreement, which states that, if the Forbearance Agreement conflicts with, *inter alia*, the Lease, then the Forbearance Agreement controls. (Dkt. 17 at 30). From this, Plaintiffs assert that the "subject to appropriations" language in the Lease "undeniably conflicts" with the purportedly "mandatory payment obligations set forth in the Forbearance Agreement," so "the provisions in the Lease Agreement creating a 'moral obligation' have been superseded." (*Id.*). This argument falters for several reasons.

First, as the Court has painstakingly detailed, the Forbearance Agreement, *e.g.*, §§ 2, 5.1, 5.3, 5.4, expressly includes the "subject to appropriations" language, not mandatory payment obligations.

Second, these provisions in no way conflict with the Lease. They are in fact consistent

– 22 –

Agreements for the City's refusal to appropriate rent payments, because the City was not legally (as opposed to morally) obligated to make those payments in the first place. All this comports with what these sophisticated parties would have understood at the time, especially against the backdrop of the Virginia Constitution's prohibition on future financial commitments by municipalities.

### 2. Representation regarding validity of the City Deed of Trust

There remains, however, a residuum of Counts 5 and 6. Aside from the nonpayment theory, Plaintiffs identified only one other alleged breach of the Lease and Forbearance Agreements in response to Defendants' motions to dismiss. (*See* dkt. 17 (Pls' Br. against City) at 30, 33; dkt. 18 (Pls' Br. against Authority) at 9). The theory is that—because §§ 2.2(c), (e), (i), and 6.1(a)(2) of the Lease, and §§ 6 and 7(i) of the Forbearance Agreements included representations affirming the validity of the City Deed of Trust, and because the City claims the Deed of Trust is void—the supposed voidness of the Deed of Trust establishes a breach of the Lease and Forbearance Agreements. As explained earlier, the City Deed of Trust is not void, so this theory does not prevail.

### B. Breach of Trust Agreement by the Authority (Count 2)

Count 2 asserts a breach of the Trust Agreement by the Authority. In response to the Authority's motion to dismiss, Plaintiffs advanced two theories of this Count. Neither succeeds.

---

with it, having incorporated by reference the Lease, which also is subject to appropriations.

Third, even if there was a conflict, the Forbearance Agreement, § 10, contains an express "no novation" clause. *See Honeywell, Inc. v. Elliott*, 213 Va. 86, 89–90 (Va. 1972) (requiring clear intention to establish novation, which is never presumed, and finding evidence lacking); *Johnston v. Lamson Co.*, 159 Va. 666, 678–80 (Va. 1933) (same).

### 1.     Failure to pay

Citing §§ 1001(c) and 1101, Plaintiffs first say "that the Authority breached the terms and conditions of the Trust Agreement by failing to make interest and principal payments on the Bonds." (Dkt. 18 at 4).  That single sentence is the extent of Plaintiffs' "argument."  They do not quote the Trust Agreement's text, discuss its meaning, or undertake any analysis explaining how the facts satisfy the contractual provisions.  This failure alone justifies finding the matter conceded, and the Court so holds.  *See Walker v. Prince George's Cty., Md.*, 575 F.3d 426, 428–29, n.* (4th Cir. 2009) (finding that mere assertion that a particular right was violated is waiver when party "fail[s] to present an argument to that effect—indeed, even to discuss those provisions").  Courts are not expected to fashion even a *pro se* litigant's arguments for it, much less one represented by counsel.[18]

In any event, the theory is incorrect.  Section 1001(c) does covenant that the Authority will "promptly pay the principal and premium, if any, and interest on the Bonds."[19]  But that section continues:  "provided, however, that such obligations are limited obligations of the Authority, payable solely from the Payments of [rent] and the property secured by the Deed of Trust."  *See also id*. § 1703 (stating that Authority's obligations "are not general obligations" but "are limited obligations payable solely from payments" of the City's rent and "property pledged pursuant to" Defendants' deeds of trust).[20]

---

[18]     *See Williams v. Ozmint*, 716 F.3d 801, 809 n.12 (4th Cir. 2013); *Greene v. Cty. of Durham Office of Sheriff Dep't*, No. 1:14-CV-153, 2014 WL 5465371, at *5 n.3 (M.D.N.C. Oct. 28, 2014) (compiling Fourth Circuit cases).

[19]     Section 1101(a)-(b) makes nonpayment of these funds "when due and payable" an event of default.

[20]     The wording of the Trust Agreement significantly mirrors the *Dykes* case discussed above.  *Dykes*, 242 Va. at 263 ("The trust agreement, and the bonds themselves, would provide

At this point, it is useful to keep in mind the overarching structure of the financing transactions: Recall that the Authority was simultaneously assigning to UMB Bank the golf course rent it received from the City. (Trust Agreement, § 101). Thus, § 1001(c) made bond payments due from the Authority only to the extent that the money came from (1) rent payments made by the City, or (2) the secured property (*i.e.*, the golf course secured by the Authority Deed of Trust, and City Hall secured by the City Deed of Trust).

This reading—and resulting nonliability of the Authority for failure to make bond payments if such failure stemmed from the City's failure to make rent payments—is confirmed by § 1003. It commands that the "Authority *shall have no obligation or liability* to the Trustee [*i.e.*, UMB Bank] or the Bondholders with respect to the payment of the [rent] by the City when due or with respect to the performance by the City of any other covenant made by it in the Lease Agreement." *See also id*. § 1703. As the Authority puts it, "if the City fails to pay rent, the Authority is not in breach for failing to make [bond] payments" (dkt. 20 at 2), since the Authority's money simply comes from the City's rent payments.

## 2. Various failures to act against the City

"Additionally," Plaintiffs write, "the Authority failed to (a) ensure that the City complied with its obligations under the Lease Agreement, (b) cancel the Lease Agreement once the City defaulted on its rent obligations, and (c) exclude the City from possession of the golf course." (Dkt. 18 at 5). Once again, other than appending to this assertion a few citations to the record,

---

that '[t]he Bonds are limited obligations of the Commission payable solely from' the moneys provided to the Trustee by the County. The trust agreement further would provide that '[t]he obligation of the County . . . to make such payments . . . is subject to and contingent upon the annual appropriation by the County of moneys for such purpose.'"); *see also Baliles v. Mazur*, 224 Va. 462, 467–69 (Va. 1982).

Plaintiffs make no effort to expound or elaborate upon it. Their contentions are therefore ineffectually raised. *See Walker*, 575 F.3d at 428–29, n.*; *Williams*, 716 F.3d at 809 n.12.

From what the Court can divine from these assertions, they fail on the merits as well. Section 1001(e) of the Trust Agreement states, in pertinent part, that the Authority "will require to City to perform its duties and obligations under the Lease Agreement and that it will not agree to any abatement, reduction, abrogation, waiver, diminution or other modification of the obligation of the City to make rental payments and to meet any of its obligations under the Lease Agreement." So to breach this provision, the Authority had to fail to force the City to do something that the Lease required the City to do.[21]

Ensuring City's compliance with the Lease. Plaintiffs' brief does not specify which of the City's obligations under the Lease that the Authority purportedly failed to "ensure" the City complied with. The crux of this case, of course, is Plaintiffs' contention that the City is legally obliged to appropriate rent payments, a point which has already been dispatched. Since the City had no legally enforceable obligation to pay rent, the Authority could not have breached the Trust Agreement by failing to make the City do so.

Cancelling the Lease for nonpayment; excluding the City from the golf course. This reference alludes to § 6.2(b) of the Lease, permitting—upon an "event of default"—termination of the Lease, ejection of the City from the golf course, and sale of the course. There are several deficiencies here.

To the extent this theory turns upon nonpayment of rent, § 6.1(c) reveals that nonpayment is not an event of default triggering the actions under § 6.2(b). Section 7.1 would instead apply,

---

[21]     It has not been argued, nor is it apparent from the Complaint, that the Authority made a prohibited agreement with the City to reduce the rent payments.

and while it grants the Authority "the right" to terminate the Lease, it does not *require* the Authority to do so.

To the extent this theory relies on a non-rent obligation of the City, § 6.2 does not require the Authority to take action, and it indeed permits Plaintiffs—of their own accord—to perform the acts they complain the Authority has failed to take.

> Whenever any event of default shall have happened and is continuing, *the Trustee* [Plaintiff UMB Bank] (or the Authority acting *at the direction of the Trustee*) *may*, with the prior written consent of the *Bond Insurer* [Plaintiff ACA], and *shall*, *at the direction of the Bond Insurer*, take any one or more of the following remedial steps . . . .

(emphasis added). The Authority only "may"—not must—act upon Plaintiff UMB Bank's direction. It only "shall" act upon direction from Plaintiff ACA. The Complaint does not allege, and Plaintiffs have not argued, that either of these preconditions to action by the Authority have occurred. So it hardly could be a breach for the Authority to have failed to act.

Of course, if Plaintiffs wanted to take over the golf course, § 6.2 allows them to do so upon their own agreement. *See also id.* §§ 8.1(a), 9.4. ACA could even do so unilaterally, by simply "direct[ing]" UMB Bank.[22] But Plaintiffs have not evicted the City, and their efforts to paint the Authority's failure to do so as a breach are unsuccessful.[23]

---

[22] Why bother suing the Authority for the failure to do some act Plaintiffs could accomplish themselves? One reason might be a preference for money over land. Plaintiffs bargained in 2005 and again in 2011 for uncertain future payments. Knowing that the City might one day stiff them, they obtained the deeds of trust as security. But now, having lost out on payments they knew they might never see, Plaintiffs seek to expand the scope of their bargain and extract money from the City.

[23] In passing at oral argument, Plaintiffs cited § 1001(g) of the Trust Agreement, characterized as imposing on the Authority a duty to "cooperate," which they asserted the Authority failed to do. (Dkt. 35 at 18–19, 20–21).

Plaintiffs' brief neither mentioned § 1001(g) nor raised this point, *see* dkt. 18 at 4–7, so it is not properly before the Court. *Walker v*, 575 F.3d at 428–29, n.* (waiver when "argument" is simply a conclusory assertion of legal violation); *Williams*, 716 F.3d at 809 n.12. (*continued*)

### C. Breach of City and Authority Deeds of Trust (Count 3 and 4)

Counts 3 and 4 posit that Defendants breached the terms of their respective deeds of trust. But these counts also do not state a claim.

#### 1. Environmental study and compliance with other laws

Section 1.14.3 of the Authority Deed of Trust and § 1.15.3 of the City Deed of Trust require, under certain circumstances, Defendants to conduct an environmental study if reasonably requested by Plaintiff UMB Bank. The Complaint contained a single reference to these provisions, which is nothing more than a legal conclusion as to its content. (Complaint ¶¶ 22, 33). Despite nominally requesting injunctive relief on this score against only the City, *id.* at Prayer for Relief (m), the Complaint contains no facts supporting this theory (such as whether a request for a study has even been made), and Plaintiffs' brief does not defend it. (*See* dkt. 18 at 7–9). Therefore, the Court finds the theory conceded.

Turning to § 1.11 of both deeds of trust, paragraphs 21 and 32 of the Complaint similarly contain solitary, conclusory references to its content, characterized by Plaintiffs as requiring Defendants to comply with all federal, state, and local laws, including the Americans with Disabilities Act (ADA). To defend this theory, Plaintiffs only meekly refer to their cursory legal conclusion that the Authority did not comply with federal law. (Dkt. 18 at 8–9). This is

---

Moreover, the Complaint (¶ 52) includes a single conclusory legal assertion about § 1001(g), and is devoid of facts showing, *e.g.*, how the Authority failed to cooperate; how such failure caused Plaintiffs any damage; what steps Plaintiffs would have had the Authority take vis-à-vis the City; how those steps would have made any difference to, for instance, the City's steadfast refusal to pay money it had no enforceable obligation to pay; or why anything the Authority (which is simply a creature of the City, *see* Complaint ¶ 4) said or did would have sway over the City's decisionmaking.

insufficient under *Twombly* and *Iqbal*.  As the Complaint contains no facts supporting a breach of § 1.11, this theory will be dismissed.[24]

### 2. Payments and other, unspecified breach of other agreements

Plaintiffs quote their Complaint's own legal conclusion that the Authority breached its Deed of Trust "in a number of material ways, including, but not limited to, by breaching the covenant to faithfully observe and perform all the covenants in the Authority Deed of Trust." (Dkt. 18 at 7 (quoting Complaint ¶ 97)).  That is, Plaintiffs say the Authority has breached its covenant to abide by its other covenants.

The substance of these "other covenants" remains a mystery.  Plaintiffs merely refer to portions of the Deed of Trust, and parenthetically characterize them as defining a default as any failure of the Authority's covenants, duties, or warranties (or any event of default under the other financing agreements)—all without ever identifying the substantive content of whatever duty, warranty, representation was supposedly transgressed.  This is little more than a shell game: Plaintiffs assert that the Authority Deed of Trust contains unspecified obligations intrinsic and extrinsic to it, but they never put a finger on what those supposed obligations are, or how they were violated.  They do not craft an argument or advance a legal theory, but instead assert a bald conclusion.  It is not the Court's role to do the former for Plaintiffs, and the Court declines the invitation to adopt the latter on faith.

---

[24]    In a footnote, Plaintiffs conditionally seek leave to amend the Complaint.  (Dkt. 18 at 9 n.2).  That is not a proper motion.  The Fourth Circuit has repeatedly affirmed the denial of requests to amend raised "only in a footnote of [plaintiffs'] response brief to defendants' motion to dismiss."  *Cozzarelli v. Inspire Pharm. Inc.*, 549 F.3d 618, 630–31 (4th Cir. 2008) (citing Fed. R. Civ. P. 7(b), 15(a)).  "Regardless of the merits of the desired amendment, a district court does not abuse its discretion by declining to grant a motion that was never properly made."  *Drager v. PLIVA USA, Inc.*, 741 F.3d 470, 474 (4th Cir. 2014).

Plaintiffs next recycle the argument that Defendants owe them payments. (Dkt. 17 at 25–26; dkt. 18 at 7–8). This is so under the Deeds of Trust, they claim, because these agreements incorporate the bond payment obligations in the Trust Agreement. As explained earlier, the Trust Agreement (and the Lease or Forbearance Agreements, for that matter) do not contain a binding obligation on the Authority to make payments.

Lastly, Plaintiffs block quote sections of the City Deed of Trust in hopes of establishing an entitlement to payment. (Dkt. 17 at 25–27). Those quotations are accompanied by Plaintiffs' pattern of exerting no effort to identify an actual legal theory of their claim, explain why the contract entitles them to relief, or otherwise analyze the text of the operative documents. It "is not this court's responsibility to . . . construct the parties' arguments," *Spath v. Hayes Wheels Int'l-Indiana, Inc.*, 211 F.3d 392, 397 (7th Cir. 2000), or "a legal theory on a plaintiff's behalf." *Whitney v. New Mexico*, 113 F.3d 1170, 1173–74 (10th Cir. 1997). This is especially so when a plaintiff is represented by counsel. *United States v. Smith*, 26 F.3d 739, 743 (7th Cir. 1994). "District judges are not mind readers," the Fourth Circuit has said, and are not required "to anticipate all arguments that clever counsel may present in some appellate future." *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985). To demand otherwise would "transform" a court "to the improper role of an advocate seeking out the strongest arguments and most successful strategies for a party." *Id.*; *see Liberty Corp. v. NCNB Nat. Bank of S.C.*, 984 F.2d 1383, 1390 (4th Cir. 1993) (quoting with approval principle that waiver applies to "[a]rguments raised in the District Court in a perfunctory and underdeveloped manner").

That some actual analysis is needed here is shown by even a cursory effort to grapple with the text. Both provisions that Plaintiffs rely on, §§ 4.6 and 4.10, are contingent on an

"Event of Default." In turn, an event of default under the City Deed of Trust is defined as any one of six, specified events. *See* §§ 3.1–3.6. .

But that's not all. One of those six events of default itself *further* incorporates whatever qualifies as an "Event of Default under the Trust Agreement, Bonds or any other Basic Agreement," the latter of which includes the Lease. *Id.* § 3.1 & p.2 (defining "Basic Agreements"); *see also id.* § 1.1 (securing whatever amount of indebtedness is "set forth in the Bonds, this Deed of Trust, and the Trust Agreement"). In other words, the matter is hardly resolvable by simply quoting §§ 4.6 and 4.10.

Yet Plaintiffs do not engage with this thorny entanglement. They do not specify which event(s) of default allegedly occurred under the City Deed of Trust, or whether such default is sourced to another document. And even that goes only to the precondition in §§ 4.6 and 4.10, not to the substantive question of "what provision creates the City's binding duty to pay?" In short, there is no attempt to piece together these incestuous, cross-referencing documents, interpret their meaning, and apply that meaning to the facts in hopes of establishing that the City breached some as-yet-unidentified, enforceable duty to appropriate. By failing to do so, Plaintiffs waived the matter. *Ozmint*, 716 F.3d at 809 n.12; *Walker*, 575 F.3d at 428–29, n.*; *Beaudett*, 775 F.2d at 1278. The Court need not scour the contracts to concoct or divine arguments on their behalf. *Hensley ex rel N.C. v. Price*, 876 F.3d 573, 580 n.5 (4th Cir. 2017) (It "is not our job to wade through the record and make arguments for either party.").

Notwithstanding waiver, it appears that Plaintiffs—even if they had tried—could not develop a theory entitling them to payment. For one, the portions they quote do not impose a freestanding obligation to pay on the City. Section 4.6 explains only that UMB Bank may, upon default, "institute" a lawsuit to seek "collection of sums *so due* and unpaid" before seeking

foreclosure. That is unremarkable. In plain English, UMB Bank can file a lawsuit to seek money *owed* without having to first foreclose. But § 4.6 does not establish what, if anything, UMB Bank is actually owed. Similarly, § 4.10 makes cumulative whatever rights and remedies UMB Bank has, but it does not create or define the contours of those rights and remedies.

Additionally, the documents cross-referenced in these provisions do not establish a binding obligation on the City to pay. Section 4.6 refers to defaults under "the Bonds, this Deed of Trust or the Trust Agreement," and § 4.10 refers to securing the Bonds and obligations "under the Basic Agreements" (meaning the City Deed of Trust, the Trust Agreement, the Bonds, and the Lease Agreement). As explained throughout this opinion, those documents do not contain a legally enforceable obligation against the City to appropriate rent payments. The Bonds are the only such documents not discussed above. But unsurprisingly and in congruence with the other agreements, the Bonds make clear that the City is not obliged to make appropriations and that the Authority is not liable for the City's failure to appropriate. (Dkt. 103 at ECF 59–60, 63, 68–69, 72).[25]

So, to refresh, Plaintiffs cannot establish that the City had anything more than a moral obligation to repay them. Subjected to detailed examination, Plaintiffs' theory is like a defective Rube Goldberg device—a confounding, complicated web of contractual cross-references that ultimately fails to accomplish its goal. Its confusing framework does not justify a fishing

---

[25] The point that no document establishes a binding obligation on the City to pay also dispatches Plaintiffs' reliance on § 1.1 of the City Deed of Trust. It states that the City "shall pay all indebtedness secured by this Deed of Trust" in the amounts set forth therein, as well as in the Bonds and the Trust Agreement. As already explained, none of those documents contains an enforceable payment obligation on the City regarding the loans. Indeed, as hopefully is by now apparent, the documents all contemplated the same overarching structure and function, as further illustrated by their matching, intertwined payment schedules of the City's rent flowing to the Authority (per the Lease Agreement) then to UMB Bank (per the Trust Agreement) to pay off the Bonds. *Compare* Lease Agreement, Ex. A (Schedule of Basic Rent) *with* Trust Agreement, § 501 *and* dkt. 1-3 at ECF 61–62, 70–71 (Form of Bonds).

expedition undertaken to establish leverage in negotiations. *See* Hr'g Tr. at 83 (Plaintiffs' counsel: "[Y]ou deny the motion to dismiss, you let us go through our discovery, you let me kick the tires, you let me open up the hood, you let me examine it, and I think you're going to find out the parties are going to sit down and work something out."). Counts 3 and 4 will be dismissed.

### D. Breach of Good Faith and Fair Dealing (Count 7)

A good faith/fair dealing claim sounds in contract. *Charles E. Brauer Co. v. NationsBank of Virginia, N.A.*, 251 Va. 28, 33 (Va. 1996). The duty of good faith and fair dealing "cannot be the vehicle for rewriting an unambiguous contract in order to create duties that do not otherwise exist." *Ward's Equip., Inc. v. New Holland N. Am., Inc.*, 254 Va. 379, 385 (1997). The Court has already explained that, under the plain language of the financing documents, Defendants had no enforceable contractual duty to appropriate payments, so *Ward's Equipment* requires rejection of this count, insofar as it rests on Defendants' failure to pay.

Plaintiffs claim that they alleged the City unfairly induced them "to defer the exercise of their rights under the Forbearance Agreements." (Dkt. 17 at 34 (citing Complaint ¶ 126)). Plaintiffs do not explain what rights they had under the Forbearance Agreement that they deferred. (*Id.*). Moreover, the Complaint does not contain facts identifying what conduct Defendants undertook after the 2011 Forbearance Agreement that unfairly forestalled action by Plaintiffs.

Finally, Plaintiffs complain that the City has "unfairly and belatedly challenged the validity" of unspecified Financing Agreements (by which they must mean the City Deed of Trust), notwithstanding legal opinions to the contrary provided by the City to Plaintiffs. (*Id.* (citing Complaint ¶ 127)). Plaintiffs cite no authority (much less controlling Virginia precedent)

for the proposition that making legal arguments to defend one's position is a breach of good faith, and the Court has found none. *Cf. Shibata v. Lim*, 133 F. Supp. 2d 1311, 1321 & n.4 (M.D. Fla. 2000) (finding "no basis in [Florida] law for" a "broad extension of the good faith covenant" to cover assertions of legal positions or the litigation of contract claims and defense). Their position would both deter the resolution of *bona fide* disputes and gin up additional litigation, because it risks turning any good-faith (but ultimately mistaken) assertion of a legal position into a separate breach of contract.

What's more, Virginia law placed the onus on Plaintiffs to themselves confirm that the agreements they signed with the City were within its lawful authority, so they cannot now complain of the City's assertion that the Deed of Trust is void. Since at least the nineteenth century, it has been "a general and fundamental principle of law that all persons contracting with a municipal corporation must *at their peril inquire into the power* of the corporation or of its officers to make the contract." *Am.-LaFrance & Foamite Indus. v. Arlington Cty.*, 164 Va. 1, 9 (Va. 1935) (quoting *City of Winchester v. Redmond*, 93 Va. 711 (Va. 1896)) (emphasis in original).[26] "Those who deal with public officials must at their peril take cognizance of their power and its limits. A failure to do so places them *in pari delicto.*" *City of Bristol v. Dominion Nat. Bank*, 153 Va. 71, 83 (Va. 1929). Plaintiffs' theory—that the City's assertion that its deed of trust was void under Virginia law is a breach—would turn this longstanding policy on its head, shifting onto the municipality, rather than those dealing with it, the risk of wrongly ascertaining the municipality's authority.

---

[26] Numerous other cases so hold. *See Thomas v. City of Richmond*, 79 U.S. 349, 357 (1870); *King George Cty. Serv. Auth. v. Presidential Serv. Co. Tier II*, 267 Va. 448, 456 (Va. 2004) ("Anyone dealing with an officer or employee of a public body must ascertain the extent and nature of that person's authority."); *York Cty. v. King's Villa, Inc.*, 226 Va. 447, 450 (Va. 1983); *Richard L. Deal & Assocs., Inc. v. Virginia*, 224 Va. 618, 623 (Va. 1983).

Count 7, then, will be dismissed.

*     *     *

There is no enforceable obligation that requires Defendants to pay Plaintiffs.  As for the real estate seemingly secured by the deeds of trust, Plaintiffs have not sought foreclosure in this case.  Complaint, Prayer for Relief; *see* Hr'g Tr. at 7 (contending that trustees are unnecessary because this lawsuit does not presently involve foreclosure).  And Defendants have not contested that nonpayment triggers Plaintiffs' ability to foreclose, if Plaintiffs ultimately decide to.  Hr'g Tr. at 28, 48–49, 57.  In any event, the point is that the issue of foreclosure is not presented in this case, so the speculative prospect of it does not avert dismissal.

## SUMMARY

Having spent several pages deep in the weeds, it is helpful to pan out to the wider landscape.  These are sophisticated parties:  a national bank; an insurance company; municipal entities represented by in-house counsel and a prominent regional law firm.  They entered into complicated (yet entirely rational) agreements, with calculated risks and benefits to each side.

Through a bond purchase, a bank loaned several million dollars to a municipality for a golf course, to be repaid through "rent" payments (in truth, municipal appropriations) and backed by municipal property as collateral.  The bank further protected itself from the danger of municipal nonpayment with bond insurance.

The bond insurer received premiums from the bank but agreed to be on the hook for servicing the bonds if municipal appropriations ceased.

Finally, the municipality got an infusion of cash for its golf course, with an unenforceable "moral" obligation to repay the funds, but one backstopped by the threat of the bank and insurer coming after its property.

The parties' central arguments in this case would upset the delicate balance created by these interlocking agreements. Ultimately, the Court does not agree with Plaintiffs' position that the agreements imposed on Defendants a legally enforceable repayment obligation. But the Court also does not agree with Defendants' position that the City Deed of Trust is void. For those reasons and the additional ones set forth above, this case will be dismissed. An appropriate order will issue.

Entered this __8th__ day of February, 2018.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE

